IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KLAMATH-SISKIYOU WILDLANDS CENTER;
CASCADIA WILDLANDS PROJECT;
UMPQUA WATERSHEDS,

                Plaintiffs,                          Civil No. 07-6272-TC

        v.                                    O R D E R

THE BUREAU OF LAND MANAGEMENT,
an administrative agency of the United States
Department of the Interior,

                Defendant,

and

SENECA JONES TIMBER COMPANY, an
Oregon Limited Partnership,

                Defendant-Intervenor.

COFFIN, Magistrate Judge:

    Plaintiffs raise a National Environmental Policy Act (NEPA) challenge in this action. The

Bureau of Land Management (BLM) is a defendant and Seneca Jones Timber Company (Seneca) is a

defendant-intervener.

    Plaintiffs challenge BLM's Environmental Assessment (EA) of the Snow Creek Right of Way

Project(Snow Creek Project). The Project is straightforward and can be succinctly summarized:

Seneca owns private timberland adjacent to BLM land, and intends to harvest its land. Seneca proposed that BLM allow Seneca to haul the cut trees uphill over a ridge line and through a narrow strip of BLM land. Otherwise Seneca would reconstruct a logging road at the base of the slope, which is adjacent to Snow Creek, and move the trees downhill to haul them offsite. All parties agree that the downhill yarding would be more degrading to the soil and the stream. BLM ultimately authorized the Snow Creek Project. (See attached Exh. A from declaration submitted by Intervenor which depicts the Seneca property, adjacent BLM property, roads at issue, and Snow Creek.)

Plaintiff's one claim is that BLM's analysis of the Snow Creek Project's cumulative impacts was inadequate.

Presently before the court are plaintiffs' motion (#12) for summary judgment, defendant BLM's cross- motion ( #27) for summary judgment, and defendant-intervener Seneca's motion (#23) for summary judgment.


<u>Background</u>

The Snow Creek Project was proposed by Seneca to provide a right- of- way on BLM land between Seneca's private property and existing timber haul routes. Authorizing the general proposal was one of the alternatives BLM considered; not authorizing the proposal was the other alternative considered. BLM ultimately authorized the construction of two permanent logging spur roads that would be up to 60 feet in width and that would total 774 feet in length. BLM authorized the removal of approximately 35 live trees where one of the proposed roads is to be built. The Snow Creek Project is within the general area of northern spotted owl activity and is an area designated as a Late-Successional Reserve(LSR). LSRs are entitled to particular environmental protections. The EA states that the spur roads were "not expected to result in measurable behavioral impacts to

breeding, feeding, sheltering or dispersal of adjacent owls," AR 250, and were not "expected to change stability of the spotted owl population trend." AR 252. As for the small increase in road density in the area, which is already high, the EA stated: "[t]he canopy gap and ground space resulting from the increased road density is not expected to deter spotted owls from using the stand." AR 251.

Seneca made the Project proposal in connection with plans to harvest its private land. Seneca will harvest the timber on its private land regardless of whether BLM authorized the Snow Creek Project. If BLM denied the Snow Creek Project Proposal, which involved utilizing a ridge top, Seneca would upgrade and prepare lower haul routes across its private land along Snow Creek and use timber harvesting techniques appropriate to those routes. BLM determined that such action would cause greater environmental harm than permitting the Snow Creek Project. Plaintiffs conceded at oral argument that the overall environmental effect of authorizing Seneca's Snow Creek Project proposal for logging may be better than the overall environmental effect of Seneca preparing and using its road along Snow Creek for logging.[1] However, plaintiffs stated at oral argument that NEPA was violated and had the BLM complied with the appropriate NEPA process, the public and the decision would have been better informed, and, as such, the decision would have been superior.

---

[1]This can be seen in the BLM statement after the public review and comment period. BLM stated:

> Alterative 1 [no action] was not selected because this alternative was more impactive to water and soil... Alternative 1 would require development of a helicopter landing and decking within 50 feet of a water quality limited anadromous fish stream (Snow Creek), require renovation and maintenance of 1/2 to 3/4 mile of road coming with[in] 50 feet in some locations of the stream, and hauling would require crossing several intermittent streams and one perennial stream all of which would be expected to result in additional measurable increases in sediment to Snow Creek.

AR 107.

As discussed below, NEPA was not violated in the particular circumstances of this case.


Standards

Agency decisions that allegedly violate the National Environmental Policy Act  are reviewed under

the Administrative Procedure Act (APA) which  dictates that a court should hold unlawful and set

aside agency action that is arbitrary, capricious, an abuse of discretion or otherwise not in accordance

with the law.  5 U.S.C. § 706(2)(A); Oregon Natural Resources Council v. Brong, 492 F.3d 1120,

1124-1125 (9th Cir. 2007).

A court's job in reviewing an Environmental Assessment (EA)  "is to ensure that  the agency has

taken a 'hard look' at the potential environmental consequences of the proposed action."  See Brong,

492 F3d at 1132  quoting  Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 993 (9th Cir.

2004).  "While the APA requires that we not substitute our judgment for that of the agency, it

nevertheless requires us to engage in substantial inquiry and a thorough, probing, in depth review."

Brong, 492 F.3d at 1125 (citations and internal quotation marks omitted).  "NEPA does not contain

substantive environmental standards, nor does the Act mandate that agencies achieve particular

substantive environmental results."  Bering Strait Citizens for Responsible Resource Development v.

United States Army Corps of Engineers,  ----F.3d ---, 2008 WL 1885741 (9th Cir.  2008). (citation

omitted).  "Judicial review of agency decision-making under NEPA is limited to the question of

whether the agency took a 'hard look' at the proposed action as required by a strict reading of NEPA's

procedural requirements. " Id.

<u>Discussion</u>

Plaintiffs initially asserted that the issues to be decided in this case are: "Did BLM violate NEPA by failing to analyze, disclose and consider the cumulative impacts of the Snow Creek Project when added to other past, present, and reasonably foreseeable future actions?"    P. 3 of Plaintiff's Memo (#14) in Support of Summary Judgement.

Extensive briefing and oral argument in this action have narrowed the significant issues. As stated by plaintiffs, they emphasize and seek "a meaningful analysis of the actual environmental effects of each past action.  It would be impossible, in other words, to adequately disclose and consider the incremental impacts of past projects as required by the Ninth Circuit without at least disclosing the name, time , place, and scope of these projects. It is the <u>impact</u> of these projects, and the detailed consideration of how each has affected the environment that is relevant and useful to the decision. In this case, both the public and the BLM have been left without this very relevant and useful information. The BLM has failed to take a hard look at the cumulative effects of the Snow Creek Project, namely the incremental effects of past projects, and has therefore violated NEPA and the APA." P.p. 17-18 of Plaintiffs' Reply (#34)(emphasis in original) .

The question in this case is: what degree of cumulative impact analysis was BLM required to include in the Snow Creek Project Environmental Assessment to comply with the applicable law? As discussed below,  in the circumstances of this case, BLM was not required to disclose the name, time, place, and scope of past projects.  BLM did comply with the law in the circumstances of this case by providing a baseline of current environmental conditions that contains sufficient detail and useful analysis that integrates past effects of all actions in the area. This level of detail is sufficient to meet BLM's cumulative effects analysis obligation in the circumstances of this case and BLM has

taken a "hard look" at the potential environmental consequences of the Snow Creek Project.[2]


I. Cumulative Effects

As for the cumulative effects analysis central to this action, the Ninth Circuit has said :

> One of the specific requirements under NEPA is that an agency must consider the effects of the proposed action in the context of all relevant circumstances, such that where 'several actions have a cumulative ... environmental effect, this consequence must be considered in an EIS.' Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1378 (9th Cir. 1998) (quoting City of Tenakee Springs v. Clough, 915 F.2d 1308, 1312 (9th Cir. 1990).  A cumulative effect is 'the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal of non-Federal) or person undertakes such actions.' FN 18.[FN 18 provides "[i]n this context, 'effect' and 'impact' are synonymous. See 40 C.F.R. § 1508.7."] 40 C.F.R. §1508.7.


Oregon Natural Resources Council v. Brong, 492 F.3d 1120, 1132-1133 (9th Cir. 2007).


1. The Brong Case and Lands Council Case

A. The Brong Case

Brong is important in the analysis of the present case -- indeed, plaintiffs rely heavily on it and its

citation of certain case law in this area. Brong involved BLM's decision to log nearly one thousand

acres of LSR land after major forest fires.

The Brong Court stated:

> Our cases firmly establish that a cumulative effects analysis 'must be

---

[2]This is not to say that setting forth the time, place and scale of individual past activities will never or even rarely be required for a public agency to adequately evaluate the cumulative effects of past activity in the area for an informed analysis of alternatives. Many cases may call for just that, but not this one.

more than perfunctory; it must provide a *useful analysis* of the cumulative impacts of past, present, and future projects.' Klamath-Siskiyou, 387 F.3d at 994 (emphasis added)(quoting Ocean Advocates v. U.S. Army Corps pf Eng'rs, 361 F.3d 1108, 1128 (9th Cir. 2004)). To this end, we have recently noted two critical features of a cumulative effects analysis. First, it must not only describe related projects but also enumerate the environmental effects of those projects. See Lands Council v.Powell, 395 F.3d 1019, 1028 (9th Cir. 2005) (holding a cumulative effects analysis violated NEPA because it failed to provide 'adequate data of the time, place, and scale' and did not explain in detail 'how different project plans and harvest methods affected the environment'). Second, it must consider the interaction of multiple activities and cannot focus exclusively on the environmental impacts of an individual project. See Klamath-Siskiyou, 387 F.3d at 996) (finding a cumulative effects analysis inadequate when 'it only considers the effects of the very project at issue ' and does not 'take into account the combined effects that can be expected as a result of undertaking' multiple projects).[3]

Brong, 492 F.3d at 1133 (emphasis in original).

The Brong Court also stated:

The BLM must do more than merely state that the past projects contributed to environmental harms. See Lands Council, 395 F. 3d at 1027-28. In Lands Council, we found a cumulative effects analysis inadequate because it 'should have provided adequate data of the time, place, and scale of past timber harvests and should have explained in sufficient detail how different project plans and harvest methods affected the environment.' FN19. Id. at 1028.

Brong 492 F.3d at 1133. The Brong Court's Footnote 19 provides:

_____

[3]Klamath-Siskiyou is not helpful to plaintiffs in the present case. In Klamath-Siskiyou, BLM ignored three concurrent projects in the same watershed, an omission which does not occur in this case. 387 F.3d at 995. Moreover, in Klamath-Siskiyou, BLM included no information about the amount of suitable and dispersal owl habitat and road density, details which are provided in the Snow Creek Project. 387 F.3d at 994, FN.1; AR 246-247 (discussing amount of suitable nesting, roosting and foraging habitat in Snow Creek Project area); AR 233, 242 (discussing road length and density in the Snow Creek Project Area).

> The dissent asserts that Lands Council is distinguishable because here the BLM has provided several pages of 'cumulative effects analysis' Dissenting Op. at [1139]. But the BLM cannot fulfill its responsibility to conduct a cumulative effects *analyis* by merely reciting what effects have occurred, no matter how many pages it fills by doing so. As we explained in Lands Council in no uncertain terms, the time, place and scale of past activities must be included. The BLM's analysis does not meet this standard.

Brong, 492 F.3d FN 19 at 1133 (emphasis in original).

Plaintiffs contend that its claim has already been addressed "in no uncertain terms" by the Ninth Circuit Court of Appeals. P. 2 and p. 9 of Plaintiffs Memo (#14) in Support of Motion for Summary Judgment. However, plaintiffs citation does not note the fact that the "no uncertain terms" language was placed in a footnote (FN 19 above) that had the purpose of merely showing that Lands Council was applicable to the facts of the Brong case. The Brong Court did not address the facts, context and verbiage of Lands Council in great detail as such was not necessary to apply Lands Council to the facts of Brong, which, like Lands Council, involved significant logging on public lands where different approaches to such logging were possible and pertinent in *informing analysis of the alternatives presented.* As indicated below, a closer look at Lands Council indicates that there is not a requirement for detailed cataloguing of past projects with time, place, and scale of past projects regardless of circumstances and that such is not a "minimal requirement" or "basement floor" as plaintiff contends. What is required, is *"useful analysis,"* as emphasized by Brong, based on sufficient detail of how the environment was affected by past projects , that *informs analysis about alternatives,* as emphasized by other cases and Lands Council. In the present action, the description of previous environmental harm from activity in the area is set forth in sufficient detail to promote an informed analysis of alternatives by the public and BLM. Time, place and scale of past activities was not required for the public and BLM to adequately evaluate the cumulative effects of

past activity in the area for an informed analysis of alternatives. As discussed in more detail in the

latter part of this opinion, BLM adequately set forth what the applicable environmental effects were

and would be to inform analysis of alternatives. BLM then further analyzed such effects and chose

the alternative of authorizing the Snow Creek Project roads.


B. The Lands Council Case

Plaintiffs in Lands Council contested a decision of the United States Forest Service to proceed

with Modified Alternative Eight of the Iron Honey Project. Such Project was designed to improve

the aquatic, vegetative, and wildlife habitat in the Project area. As a result of intense logging all but

two of the fourteen watersheds within the Project area were not functioning or were functioning at

risk.    Modified Alternative Eight anticipated creating 17.5 million board feet of commercial

lumber by shelterwood harvesting of 1, 408 acres. Shelterwood harvesting cuts the majority, but not

all, of the trees in a given harvesting site. The version of shelterwood harvesting in the Project called

for seventy percent of the canopy to be removed in the areas to be logged. 395 F.3d at 1024-1025.

The Lands Council Court noted that the Environmental Impact Statement (EIS) generally described

past timber harvests, gave the total acres cut, with types of cutting, per decade, and asserted that the

timber harvests have contributed to the environmental problems in the Project area. But, the Court

noted, there was no catalogue of individual past projects and no discussion of how those projects

(and differences between the projects) have harmed the environment and no discussion of the

connection between individual harvests and the prior environmental harm from those harvests. The

Court noted that the EIS contained only vague discussion of the general impact of prior timber

harvesting and discussion of the environmental impact from past projects on an individual basis,

*which might have informed analysis about alternatives presented for the current project.*    395 F.3d

at 1027(emphasis added).    The Court stated, "[w]hen we consider the purposes that NEPA was

designed by Congress to serve, what was done here is inadequate." 395 F.3d at 1027.

The Lands Council Court also stated:

> The purpose of NEPA is to require disclosure of relevant
> environmental considerations that were given a 'hard look' by the
> agency, and thereby to inform public comment on proposed action and
> any choices or alternatives that might be pursued with less
> environmental harm.  To this end  we have previously held that NEPA
> requires adequate cataloguing of relevant  past projects in the area.
>
> ....
>
> The issue then is whether the description of past timber harvests and
> previous environmental harms caused by these past timber harvests
> was set forth in sufficient detail to promote an informed assessment of
> environmental considerations and policy choices by the public and
> agency personnel upon review of the Final Environmental Impact
> Statement.
>
> ....
>
> [T]he prior harvests from different projects were not separately
> discussed, neither as to their method of harvest, nor as to the
> consequences of each.  Although the agency acknowledged broad
> environmental harms from prior harvesting, the data disclosed would
> not aid the public in assessing whether one form or another of harvest
> would assist the planned forest restoration with minimal environmental
> harm.  For the public and agency personnel to adequately evaluate the
> cumulative effects of past timber harvests, the Final Environmental
> Impact Statement should have provided adequate data of time, type,
> place and scale of past timber harvests ... and should have explained in
> sufficient detail how different project plans and harvest methods
> affected the environment. The Forest Service did not do this, and
> NEPA requires otherwise.

Lands Council, 395 F.3d at 1027-1028.  (footnote omitted).

Brong's analysis relies on Lands Council.  Brong 492  F.3d at 1133.  BLM's analysis in the

present case complies with Lands Council as the description of previous environmental harm from

activity in the area is set forth in sufficient detail to promote an informed analysis of alternatives by

BLM and the public.[4]


2. Additional Cases

A requirement for detailed cataloging of individual past projects regardless of circumstances is

not supported by Northwest Environmental Advocates v. National Marine Fisheries Service, 460

F.3d 1125 (9th Cir. 2006). Nor is a requirement for detailed cataloging of individual past projects

regardless of circumstances supported by Bering Strait Citizens for Responsible Resource

Development v. United States Army Corps of Engineers, ---- F.3d ---, 2008 WL 1885741 (9th Cir.

2008).

In Northwest Environmental Advocates(NWEA), the court acknowledged:

> We have held that an environmental impact statement must 'catalogue
> adequately past projects in the area' and provide 'useful analysis of the
> cumulative impact of past, present, and future projects. City of
> Carmel- by-the-Sea, 123 F.3d at 1160, see Lands Council, 395 F.3d at
> 1027.


NWEA at 1134.

However, The NWEA Court also stated:

> NWEA argues that the FSEIS does not adequately analyze the
> cumulative effects of salinity increases from past projects, notably the
> MCR project. We disagree. Because the FSEIS concludes that the
> channel deepening project will have virtually no effect on salinity
> detailed cataloguing of past project's impact on salinity would not have
> 'informed analysis about alternatives presented for the current project'

---

[4]The information in the EA was evidently sufficient for the plaintiffs who are members of
the public to make informed objections to the project. For example, plaintiff Umpqua
Watershed's comments urged a narrower road, AR 169, advocated retention of larger trees, AR
170, and advocated exclusion of roads from the LSR. Comments of Klamath-Siskiyou
Wildlands Center voiced objection to the road in the LSR, AR 173-175, and advocated helicopter
yarding. The EA contained more than adequate information about the location and
environmental effects of the proposed roads to inform both the public and BLM.

and was unnecessary. Id (citing Lands Council, 395 F.3d at 1027).
 Contrary to NWEA's assessment, the Corp's extensive analysis of the
channel deepening  project's impact on salinity did indeed include data
encompassing past projects. See infra, Part IV. D.ii. The Corp's
analysis includes historical data regarding salinity intrusion dating to
the 1980s.  The FSEIS references the salinity analysis in the 1983
environmental impact statement for the MCR project, which
anticipated that the MCR project would yield minor salinity increases
in the estuary.  The Corps also stated during the comment period prior
to issuing the FSEIS that the 'description of existing conditions
includes the cumulative impact of historical actions.'   The Sustainable
Ecosystems Institute panel agreed, stating that 'the baseline for
evaluating information should be the current conditions or state of the
physical and biological components and relationships of the lower
Columbia River ecosystems.' Critically, numerous present-day studies
cited in the FSEIS reveal that the channel deepening project will have
little  or no impact on salinity intrusion.
NWEA relies on Lands Council, which states that 'the Environmental
Impact Statement must give a sufficiently detailed catalogue of past,
present, and future projects, and provide adequate analysis about how
these projects, and differences between these projects, are thought to
have impacted the environment. 395 F.3d at 1028. Lands Council
held as insufficient an environmental impact statement that had 'no
discussion of the environmental impact from past [timber harvesting]
projects on an individual basis, *which might have  informed analysis*
about alternatives presented for the current project.' Id. at 1027
(emphasis added).  Cataloguing past logging projects' environmental
impact would serve the purpose of promoting 'an informed assessment
of environmental considerations and policy choices by the public and
agency personnel upon review of the Final Environmental Impact
Statement.' Id. at 1028.  Here, however, numerous studies in the
FSEIS demonstrate that the channel deepening project would have
virtually no effect on salinity.  Therefore, in this case, cataloguing past
projects' effects on salinity would not have informed assessments
about the project and its alternatives, and the FSES's analysis of this
topic was sufficient.

NWEA at 1140. [5]

---

[5]Plaintiffs contend that NWEA is not applicable to the present case as it is distinguishable
on its facts.  Plaintiff argues, in part, that the present case is distinguished by the conclusion the
U. S. Fish and Wildlife Service (USFWS)  formulated after it was consulted on the Project by
BLM.  The USFWS Biological Assessment  concluded that the proposed action "may affect, but
(continued...)

Berring was decided after Brong. The Bering Court stated:

> The EA here succinctly but adequately discusses the cumulative
> impacts of the project and points out the Corp's determination that the
> project will leave portions of the drainage in 'more natural conditions
> than currently exist' due to mitigation measures taken in the permit.
> To be sure, the EA does not discuss at length other projects taking
> place in the Nome region. However, the record indicates -and we were
> assured at oral argument-that this is because there are no projects of
> similar magnitude at this time. Also, plaintiff has pointed to no past,
> present, or reasonably foreseeable comparable in environmental impact
> to the Rock Creek Mine Project. This fairly distinguishes Klamath-
> Siskiyou, because there the agency failed to consider four known and
> comparable projects that were proceeding in the permitting process.

Bering , ---F.3d ---, 2008 WL 1885741, at 12.

The underlying EA in Bering provided, in part:

> Cumulative Impacts :
> The proposed project, if authorized, would result in direct and
> secondary impacts to 346.5 acres of waters of the U.S. and impacts to
> 422.5 acres of uplands. This could be considered a large amount of
> disturbance; however, in order for cumulative impact analyses to be
> meaningful, the analyses must be properly bounded. The proper
> boundary for this analysis encompasses the Nome region. Placed
> within this context, 240.5 acres of permanent disturbance to waters of
> the U.S. represents only .95 of the Snake River watershed alone.
> Virtually all drainages within the Snake and Solomon River
> watersheds have previously been extensively mined, the Corps has

---

[5](...continued)
is Not likely to affect (NLAA) the spotted owl." AR 210, See also AR 202-217. It is true that
NWEA is not on all fours with the facts of this case. However, NWEA does refute plaintiffs'
argument that there is a requirement for detailed cataloguing of individual past projects with
time, place, and scale of past projects regardless of circumstances and that such is a "minimal
requirement" or "basement floor." NWEA emphasized the importance of material informing
analysis of alternatives presented. Moreover, Bering, a case involving a contemplated mining
project and addressing the cumulative effects of past mining, refutes plaintiffs' arguments as
well.

13 - ORDER

reviewed approximately 50 placer mining applications in the Snake
River and Solomon River watersheds from 2001 though 2006.
Approximately 500  acres of placer ground has been mined and
reclaimed during this  timeframe in these  watersheds. This includes
portions of the Rock Creek and Big Hurrah drainages, including the
proposed mine sites.

It is anticipated that, upon completion of mining and reclamation
activities in Big Hurrah Creek, portions of the drainages would be
restored to more natural conditions than currently exist.  Upon
completion of reclamation, it is anticipated that willow habitat, which
has been identified as higher value habitat, and wetlands would re-
establish over time in portions of the area.

....

[See EID, Section 9.0 Cumulative Effects, pp. 327-332 for additional
information.]

Exhibit A to Defendant-Intervener's Reply (# 35 ).

The <u>Bering</u> Court approved this cumulative impacts analysis and commented:

The Corps also considered the cumulative impact of placer mining in
the region.  In our view, impact of the isolated, small-scale placer
mining that exists in the Nome region today is not germane to the
cumulative impacts assessment of the large-scale hard rock mining
project at issue here.  In addition, we understand that reclamation is
required at the end of placer mining projects.  <u>See</u> Alasks Stat.
§27.19.020.  Because nearly all of the Nome district has been
previously mined, much of it prior to the introduction of reclamation
requirements, any new placer mining projects will result in
remediation of historic mining impacts.  BCS has not identified any
comparable project -past, present, or future-that could call into
question the cumulative impacts analysis.  Under the total
circumstances, we conclude that the Corps cumulative impact analysis
was adequate.

<u>Id.</u>

In addition to <u>Brong</u> and <u>Klamth-Siskiyou</u>,  Plaintiff has  relied on <u>ONRC v. BLM,</u> 470 F.3d 818

(9th Cir. 2006).  Such case has limited applicability to the circumstances of the present case.     The

relatively short opinion was filed after  <u>Lands Council</u> and <u>Klamath-Siskiyou</u> .  It  involved an EA

for a  logging project on public lands.  The <u>ONRC v. BLM </u> Court found that the EA at issue was

deficient because, like in Klamath-Siskiyou, it lacked sufficient underlying detail and had a

conclusory presentation of effects. ONRC v. BLM, 470 F.3d at 822-823. As previously noted,

Klamath v. Siskiyou is not helpful to plaintiff in the present case. In Klamath-Siskiyou, BLM

ignored three concurrent projects in the same watershed, an omission which does not occur in this

case. 387 F.3d at 995. Moreover, in Klamath-Siskiyou, BLM included no information about the

amount of suitable and dispersal owl habitat and road density, details which are provided in the

Snow Creek Project. 387 F.3d at 994, FN.1; AR 246-247 (discussing amount of suitable nesting,

roosting and foraging habitat in Snow Creek Project area); AR 233, 242 (discussing road length and

density in the Snow Creek Project Area). It should be also noted that ONRC v. BLM was argued and

submitted prior to NWEA and Berring. Unlike the EA in ONRC v. BLM, the EA for the Snow

Creek Project is supported by proper procedure as it is sufficiently detailed and has a useful analysis

that informs its particular alternatives. As discussed in more detail below, the EA in the present

case focuses on whether detailed analysis of individual past projects is necessary to inform the

decision regarding the construction of the Snow Creek Project roads. It also discusses mitigation[6]

and has an analysis of the effects themselves that was considered in choosing the alternative of

authorizing the Snow Creek Project roads.

---

[6]An EA must "include a useful analysis of the cumulative impacts of past ... projects. This means a discussion and an analysis in sufficient depth and detail to assist the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts." Muckleshoot Indian Tribe v. United States Forest Service, 177 F.3d 800, 809-810 (9th Cir. 1999)(internal quotation marks and citations omitted). BLM has already adopted numerous mitigation measures, probably the most important of which are to select routes through LSRs to have the least impact on LSR habitat, AR 224, and to require hauling during dry periods of the year. BLM explains that "the right-of-way location has been marked by BLM personnel to minimize impacts to Late-Successional-Reserve stand by reducing road width where possible while accomplishing engineering standards." AR 251. Only 35 conifer trees will be harvested and only three of these trees are greater than 30 inches in diameter. AR 228.

3. Additional Application of Case law

In their motion for summary judgment, plaintiffs primarily focus on concerns over the effects on the LSR habitat for northern spotted owls. Plaintiff's Memo at p.p13, 15, Plaintiff's Concise Statement of Material Facts, Paragraphs 4-7.    BLM in the present action is not evaluating what silvicultural treatment it will use to manage forest stands. The Snow Creek Project cannot fairly be described as a timber sale or harvest project. It is a road building project, designed to minimize the environmental impact of a private timberland owner's decision to harvest its own trees on adjacent property. Therefore, detailed information about individual past harvests and whether, for example, partial harvest perpetuated or accelerated the development of suitable spotted owl habitat is not relevant to a decision about clearing all vegetation from the right-of-way to construct a short road segment. Nor is information relevant about how individual harvests conducted years ago changed spotted owl habitat at the time it was cut. Habitat may have been eliminated by a certain type of harvest, unaffected by another type of harvest, and degraded by a third type of harvest. What is relevant for analysis of environmental effects in this case is the current baseline condition of spotted owl habitat in the area. As discussed in more detail below, the EA and its biological assessment fully discussed this baseline condition. AR 204-217, 246-249. This is not merely a report of acres cut by the project, but rather the condition of the forest and whether it provides spotted owl habitat. Detailed cataloguing of past actions' environmental impact by disclosing the name, type, place and scope of individual past projects would not, in the circumstances of the present case, serve the purpose of promoting "an informed assessment of environmental considerations and policy choices by the public and agency personnel upon review" of the EA. See Lands Council , 395 F.3d at 1028. The information provided of previous environmental harms in the present case was set forth in sufficient and adequate detail to promote an informed assessment of environmental conditions and

policy choices.  As stated in <u>Lands Council</u> and further emphasized in <u>NWEA</u>, whether information is sufficient and adequate  depends on whether it "*might have informed analysis* about alternatives presented for the current project."    <u>NWEA</u>, 460  F.3d at 1140(emphasis in original, citation omitted).  In the total circumstances of the present case, the baseline information provided by BLM was sufficient and adequate to meet cumulative effects requirements .  Detailed cataloguing of past actions' environmental impact by disclosing the name, type, place and scope of individual past projects  is not, in the circumstances of the present case, required.


II.  <u>Additional Detail of the EA in the Present Case</u>

The BLM stated in the EA for this case:

> As the Council on Environmental Quality (CEQ), in guidance issued on June 24, 2005, points out, 'the environmental analysis required under NEPA is forward-looking,' and review of past action is required only 'to the extent that this review informs agency decision-making regarding the Proposed Action.'  Use of information on the effects of past action may be useful in two ways according to the CEQ guidance. One is for consideration of the Proposed Action's cumulative effects, and secondly as a basis for identifying the Proposed Action's direct and indirect effects.
> The CEQ stated in this guidance that '[g]enerally agencies can conduct and adequate cumulative effects analysis by focusing on the current aggregate effects of past actions without delving into the historical details of individual past actions.'  This is because a description of the current state of  the environment inherently includes the effects of past actions.  The CEQ guidance specifies that the 'CEQ regulations do not require the consideration of the individual effects of all past actions to determine the present effects of past actions.'  Our information on the current environmental condition is more comprehensive  and more accurate for establishing a useful starting point for a cumulative effects analysis, than attempting to establish such a starting point by adding up the described effects of individual past actions to some environmental baseline condition in the past that, unlike current conditions, can no longer be verified by direct examination.

AR 230-231.

BLM scoped the Project to determine the extent to which past individual actions should

documented:

> Scoping for this project did not identify any need to exhaustively list
> individual past actions or analyze, compare or describe the
> environmental effects of individual past actions in order to complete
> an analysis which would be useful for illuminating or predicting the
> effects of the Proposed Action.

AR 231.

BLM focused the EA on data regarding the present environmental conditions within the Snow

Creek Project Area, including effects of presently on-going actions, and the  incremental impact that

the Snow Creek Project would have on those conditions.  BLM also referenced the analysis in the

Medford District Resource Management Plan.  See AR Doc 54 et seq.  BLM also consulted with

the United States Fish and Wildlife Service(USFWS) .  The USFWS prepared a Biological

Assessment for the Project addressing "the anticipated effects of the proposed road construction to

listed,  endangered, threatened, and proposed wildlife and plant species." AR 202 .  After lengthy

analysis, the USFWS service concluded that the proposed action "may affect, but is Not likely to

adversely affect (NLAA) the spotted owl." AR 210, See AR 202-217.

Although the EA has a section designated "Cumulative Effects" relevant data is contained

throughout the EA.  For example, in analyzing the effects to soil of the Snow Creek Project, BLM

detailed the current soil conditions in the watershed as they developed from both natural forces and

from past human activities within the area.  AR 231-234.  In its consideration of the impact on

habitat, BLM detailed past harvesting within the area, AR 247, improvements in demographic data

over time, AR 248, and anticipated incremental effects of the Snow Creek Project on the area.  AR

251-253.

18 - ORDER

In analyzing the environmental conditions of the Project area, BLM collected data on the open

space conditions within the drainage area, the number of acres available for future federal timber

production, current road density levels, and percentage of land compaction and impacts of

compaction on water lows and runoff. AR 241-243. BLM considered the impacts of several

current federal harvests in the area, namely Slim Jim("5 acres suitable habitat removed and is

located immediately adjacent to the LSR and Proposed Action"), Big Jim, and the Roseburg Density

Management Projects and included the impacts from those projects in its assessment of the current

environmental conditions. See e.g., AR 233, 241, 242 , 251, and 252.

BLM collected data on current conditions in the road right-of-way and measured the 35 conifer

trees that would be harvested from the right-of-way. The EA explains that the "field visits indicate

the proposed road route and adjacent area is void of large trees with broken tops or cavities,

deficient in large down wood snags and lacks vegetative layering that supports typical nesting habitat

or good quality roosting and foraging habitat." AR 247. The EA also stated:

> Approximately 774 feet of new road would be constructed on two spur
> roads on BLM land .... The proposed new road construction for road
> spur 6.1 (604') would occur within a mature mixed conifer/hardwoods
> stand ... dominated by Douglass fir and madrone. The construction of
> road spur 6.2 (170') would occur in a mixed young and mid-serial
> stand, and would not remove habitat contributing to the nesting,
> roosting, foraging, or dispersal of spotted owls ....
>  Approximately 18 conifers within the proposed road location of road
> spur 6.1 are 11-20 inches in diameter at breast height ...and
> approximately 13 conifers are 20 to 40 inches ...The construction
> would permanently remove approximately 1/2 acre of spotted owl
> suitable habitat in a narrow 40'-60' foot strip. The right-of-way
> location has been marked by BLM personnel to minimize impacts to
> the Late-Successional Reserve stand by reducing road width where
> possible while accomplishing engineering standards.
>  The amount of estimated suitable owl habitat within 1.3 miles of
> the Not So Bad Owl site [addressed further at AR 246-247, including
> a table] is approximately 1,296 acres, and is below the 1,336 acres
> considered as a general guideline for the minimum for a site within the

> Klamath Province.... Due to the small size and narrow configuration
> of habitat removal, the suitable stands effected by the removal of trees
> would not be expected to alter the known nesting selection or reduce
> the nesting potential of the adjacent owl site, and is not expected to
> result in measurable behavioral impacts to breeding, feeding,
> sheltering, or dispersal of adjacent owls. The project does not occur
> within a .7 mile range of owls, which is considered a heavily used core
> area during nesting and fledging . The stand is expected to continue to
> support the adjacent owl site by providing roosting, foraging and
> dispersal. The canopy gap and ground space resulting from the
> increased road density is not expected to deter spotted owls from using
> the stand.
> The Proposed Action is not expected to change the species viability of
> the spotted owl as determined by the Northwest Forest Plan.

AR 250-251.

The EA also states:

> Extensive harvesting on BLM [land] occurred prior to the 1990 listing
> of the spotted owl as a threatened species, and implementation of the
> NFP in 1994. Late-successional stands in this watershed are highly
> fragmented and frequently isolated from other late successional stands
> because of the checkerboard pattern of federal land ownership and past
> logging practices. Harvesting on private lands continues to be
> extensive. Most private land has been intensely harvested, much of it
> in the last few decades.... Other activities, such as quarry
> development, roadbuilding, herbicide application (private lands), and
> fire have additionally contributed to the loss of spotted owl suitable
> habitat.

AR 251.

The EA also stated that, for the "Cow Upper Section 7," the watershed baseline habitat , including

the recent and foreseeable projects is 43, 242 acres, the additional cumulative removal of 1/2 acre of

suitable habitat for the project proposal combined with other foreseeable adjacent projects "would

reduce the suitable baseline acres to approximately 43, 242 acres." AR 252, See also AR246-247.

And the "Environmental Baseline acres for suitable nesting /roosting/foraging (NRF) habitat in the

Umpqua River/Galesville LSR (#RO223) are listed as 33, 804 acres." AR 246.

The EA stated:

> The cumulative effects from the Proposed Action, when added to the effects of recent and foreseeable activities within the ... watershed ... would permanently remove elements supporting feeding, breeding and cover for a historical spotted owl site within the Section 7 watershed, which is within 1.3 miles of the home range, but is not expected to change the actual breeding productivity of the adjacent owl site, or reduce the number of viable sites within the Section 7 watershed, and is not expected to change the stability of the spotted owl population trend in the Klamath Province.

AR 253.

The EA is substantially larger than that set forth above. And, just as the plaintiff in Bering failed to identify any particular past project that should have been considered in that impacts analysis, neither have the plaintiffs in this action identified any particular project that should have been individually included here. In the total circumstances of the present case, the baseline information provided by BLM was sufficient and adequate to meet cumulative effects requirements . Detailed cataloguing of past actions' environmental impact by disclosing the name, type, place and scope of individual past projects is not, in the circumstances of the present case, required. As stated in NWEA, "NEPA requires not that an agency engage in the most exhaustive environmental analysis theoretically possible, but that it take a hard look at the relevant factors. 460 F.3d at 1139. "It is not the office of this court to pass upon the wisdom of an agency action or to require an agency to study a proposed action ad infinitum. Our role is simply to ensure that the agency has taken a hard look at the proposed action." 460 F3d at 1145. BLM has taken a 'hard look' at the potential environmental consequences of the Snow Creek Project and BLM's action is not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

Conclusion

Plaintiffs' motion (#12) for summary judgment is denied.[7]   Defendant  BLM's cross- motion (#27) for summary judgment is allowed and  defendant-intervenor Seneca's  motion (#23) for summary judgment is allowed.  This action is dismissed.


DATED this ____13___ day of June, 2008.

_____
THOMAS M. COFFIN
United States Magistrate Judge

---

[7]All of plaintiffs' arguments for summary judgment, both written and oral, have been considered and found unpersuasive.

22 - ORDER